All right, so the first case on the calendar is Arch Insurance Company v. Centerplan Construction Company. We have Mr. Garcia for the appellant. Yes, Your Honor. All right, good morning. Good morning. And we have Mr. Taylor for the appellant. Good morning, Your Honor. Good morning. All right, Judge Lynch, you're muted. Who's muted? That's because I didn't have anything to say yet. All right. All right, so Mr. Garcia, you have reserved three minutes for rebuttal. Go ahead. May it please the Court, Your Honors, thank you so much for extending this opportunity to us. We come here this morning on a matter of significant state law. State of Connecticut articulates the controlling law here, as you all know. This court sits as a diversity jurisdiction, and we find ourselves with a rather thorny question that, frankly, hasn't been addressed by virtually any other court in the country. The issue is whether the bond, which is an integral part of the surety relationship, is incorporated into and qualifies the conditions of the indemnity agreement that is the document that gives rise to the action before us. Before you get into your argument, let me just ask you one thing. There's a certain amount of these funds that you concede you owe, is that right? Yes, sir. How much? Something on the order of $7 or $8 million, which has been paid. Okay. Thank you. Just to take up a little bit more on Judge Parker's question, it started out as $39 million in round numbers. Roughly 30 of it, 31 of it arises from the construction of what is known as the Dunkin' Donuts Stadium in Hartford, Connecticut. The rest of it arose from other jobs. We don't have any problem with those, but the surety has been given about $6.5, $7 million towards that fund. We don't think there's anything that's not covered by the Hartford bonds at issue. The simple question that it all relates to is whether we're going to get to contest the damages. The surety already admits that there's at least a $1.7 million in funds that are related to claims that arise from professional malpractice. The carve-out we're speaking about in the bond is one that deals with professional malpractice. The bond literally says it doesn't apply to claims covered by professional malpractice. There's another condition in the bond- By reference to the bonds, the DBA and the DSA, if you look at the factors when we're trying to determine it under Connecticut law, you can correct me if I'm wrong, the parties aren't the same. There doesn't seem to be any temporal proximity. The indemnity agreement, the first one was in 2010. Five years later, the other agreements, and then a year later, the second indemnity agreement. The agreement doesn't mention the Hartford Stadium project or the bonds in particular. What am I missing? Why would- The last bond was done in January of 2000, literally the last bond was done a month before this contract. The last indemnity agreement, which is the principal one in this case because it has all the parties on it, was done literally within days of the execution of the contracts for this job. It was part of an overall project. The project began in the summer. I'm going to miss the years, but the summer of 2014 and extended through 2016. Well, but excuse me, Mr. Garcia, doesn't the indemnity agreement cover the entire relationship between ARC and CenterPlan? In this particular case, the last one in 2016 was freshened up literally to take into account the additional- When you say it was freshened up, what I thought was a simple question, there's a long-term relationship between ARC and CenterPlan, right? Yes, sir. During that time, ARC wrote many bonds for many projects. Yes, sir. Periodically, during that period, the parties entered this indemnity agreement, version of the indemnity agreement, and from time to time, it was slightly modified or renewed or a new version was enacted, right? It was freshened up. The more recent additions were the subsequent ads. In other words, it was done four times over a period of about four years. Right. There were certain changes in it. Some of them actually reemphasized the sole and exclusive right of ARC to settle claims and so on, but there are presumably other changes. I guess going back to Judge Bianco's question, why would it be that the indemnity agreement should be construed to incorporate the terms of any particular bond that governs bunches of bonds? First of all, the definition of loss, which in this particular case is covered by the specific bond, includes specifically references to the bonds and the underlying contracts which give rise to the liability. So in terms of definition of loss, you can't think about what a loss is unless you consider how it arises in relation to the bonds. Second of all, in Connecticut, under the Connecticut law, PSE, it analyzes the good faith payment cases and the other cases that talk about this unfettered discretion, and it recognizes it isn't unfettered. There are limits. No, of course it's not. Even without saying good faith, even before the indemnity agreements said good faith, the Connecticut Supreme Court implied good faith as in every contract that there's a covenant of good faith, and then that became incorporated explicitly in the indemnity agreements. But doesn't the indemnity agreement say that unless there is bad faith, ARC gets to decide to settle as expedient and necessary whatever claims it chooses to settle in its sole and exclusive discretion? Your Honor, I think the qualifying- Does it say that or does it not? No, I don't think it says that. I think- I think I was quoting the literal language. But Your Honor, if you look at the literal language and the other provisions, they graft onto each other these general concepts and these articulated cases which have dealt with this. So you can't- But tell me exactly which thing they incorporate in exactly what language. It's like reading a different language. The bond over the years has become interpreted, and the indemnity agreements have become interpreted by these various cases. And the PSE case, which articulates in pages 301 to 302 a good summary of why good faith has been put in these things, talks about those limits. And what we're talking about is the architectural limits of these bonds and grafted by case law. Yes. Do you at any point in your brief argue that Arch acted in bad faith? We say that the fact that they disregarded these expressed conditions of the bond limitation constitutes bad faith, and it indicates a lack of good faith. It's not our job to label it. It's our job to give you the facts and let you label it. So under your interpretation of these agreements and incorporation, Arch would be responsible for any terms of a contract in which it issued a bond. It would be responsible for everything in all these contracts, right? Okay, well, the case law is pretty clear that the bond incorporates the contracts. We're talking about something different here. We're talking about going the other way. We're talking about the bond limitation itself limiting the indemnity agreement. So in other words, there's all kinds of case law all over the country which says the bond incorporates the contracts which it guarantees. I don't think Mr. Taylor will contest that. There's no case anywhere that goes the other way that says the indemnity agreement is limited by the terms of the bond. All right, let me ask you a question about your counterclaim. I know the district judge didn't decide it on collateral estoppel grounds, but it was brief, and I want to make sure I understand your position on that. I know it was a general verdict, but in order for you to prevail on your counterclaim, there had to be a breach by Hartford, right? There was, but yes. Wait, there would have to be. That's an essential component. But in terms of the verdict itself, if Hartford breached, you know, by not having the ball parked on time, how could the jury have awarded them $335,000 against your client for your client failing to complete the stadium project? It seems to me they would have to have found that Hartford did not breach, right? Or am I missing something? Well, I think, first of all, the amount of money awarded was stipulated some relative to the money. Don't focus on the money. It was liquidated damages. That's why you have to focus on it. So it was a contractually isolated remedy, which applies for delay. So Hartford could have not breached and still recovered liquidated damages from the contractor because it was a penalty imposed for delay. So in that context, the delay was not a breach, you're saying? I'm saying they don't have to get to a breach to award the liquidated damages. All right. I understand that. All right. Thank you. Mr. Taylor, you're up. You're on mute, Mr. Taylor. That certainly won't work if I stay on mute. Probably a lot of judges I'd wish I had at some point. May it please the court. My name is William Taylor with the law firm of White and Williams in Philadelphia, and I represent the plaintiff and the appellee, Arch Insurance Company. I'd like to address some of the issues that the court just raised in its questioning of Mr. Garcia. I'm surprised that the appellants seem to now be taking the position that there is a question of good faith in this appeal when it was certainly an issue before the district court and the appellants argued that Arch had acted in bad faith. But the district court found in ruling on Arch's motion for summary judgment that there had been no evidence placed in the record by the appellants from which a jury could reasonably have found that Arch had acted in bad faith. That is one of Judge Bryant's clear findings in her memorandum opinion granting summary judgment to Arch. And in its appellate brief, the appellants specifically said that they are not raising the issue of bad faith as part of this appeal. So I'm surprised now that Mr. Garcia is always hinting that bad faith is still an issue. Bad faith is not an issue in this appeal, and it is no longer an issue in this case. And because the appellants have conceded that Arch did not act in bad faith, but rather that it acted in good faith in handling the claims presented to it under the various bonds that it had executed, there really is no issue for this court to decide. Basically, the appellants have conceded their liability if they are conceding good faith. The right to, while the overall project for the construction of the baseball stadium was complicated and involved many different parties and many different agreements, this case that's now before the court is really rather simple. It's a straightforward indemnity claim, and it's governed by the terms of the indemnity agreements that the appellants executed. And the district court ruled that Arch's rights to indemnity are governed by the indemnity agreements and the indemnity agreements only. That ruling was made as a matter of law and was the correct ruling. The district court looked at the specific indemnity provision that's set forth in the indemnity agreement and found that Arch is entitled to be indemnified for all the payments that it made in good faith. Now, I'm quoting from the indemnity agreement, under the belief that it is or was liable for the sums and amounts so dispersed or that it was necessary or expedient to make such or expediency existed. District court focused on that language as it should and determined that the payments that Arch made under the claims that have been made against it under its bonds met that standard and that therefore Arch was entitled to be indemnified by the appellants. Again, the district court also found that the appellants had presented no evidence of bad faith upon which a reasonable jury could have concluded that Arch had acted in bad faith and therefore she determined, Judge Bryant determined that Arch had met its duty, its obligations under the indemnity agreements and therefore was entitled to indemnity. Now, this question of whether or not the bonds were incorporated by reference into the indemnity agreements, it's mystical what the appellants are arguing. To respond to a question that the court raised to Mr. Garcia, the bonding question was executed not days before the bond was executed, the bonding question was executed a year before. The bond was executed in January of 2016, so over a year had passed and if the parties intended to incorporate the terms of the Hartford Stadium Performance Bond into the 2016 indemnity agreement, they would have done so. They had to do under Connecticut law, if they intended to do so, they had to do so with an unambiguous and expressed language. And as a matter of fact, in the indemnity agreement... Excuse me, Mr. Taylor, may I ask, I'm a little confused about what it would even mean to incorporate or how it would affect anything if the bond terms were incorporated by reference into the indemnity agreement. There are, I'm sure, a lot of terms in the bond and every issue about whether Arch has to pay on the bond would be based on some reading of something in the bond, right? That's correct. And the indemnity agreement has a provision that says it's up to you to decide which claims to settle and any loss that you incur, regardless of whether there actually was liability on the bond, so long as you made the decision in good faith, the center plan has to indemnify you for. So I'm a little puzzled as to what that language in the indemnity agreement could mean, whether or not the terms of the bond are somehow incorporated by reference. It still says that whether you are liable or not liable on any... Incorporating by reference meant that you couldn't get indemnity even if you settled the claim in good faith. That entire clause, which is explicit in the indemnity agreement, would be invalidated, wouldn't it? That's exactly right, Your Honor. And that's exactly my argument. That's why it's clear that the indemnity agreement did not incorporate the terms of the bonds, because that arguably could result in a different standard for indemnity, and it would basically nullify the indemnity provision of the indemnity agreement. Yeah, I guess my only question is somewhat conceptual, and maybe it doesn't make much difference if you say it this way or say it some other way. But I'm just having trouble figuring out what incorporating it by reference would mean. Of course, the claims that we're referring to and the losses that we're referring to are the ones on the bonds. But the indemnity agreement tells you when a center plan has to indemnify you for losses under the bond. Nothing in the bonds say anything about indemnity. Correct, correct. The bonds don't address indemnity at all, and the bonds are not set up to talk about indemnity. The bond is a separate agreement between Arch as the surety, center plan as the principal, and the owner of the contract, the owner in the design-build agreement, which was the bond and contract. So you're right, Your Honor, we really are talking about apples and oranges. And the only way it's arguably relevant, and I don't think it is, is because then it would bolster this defense made by the appellants, and that's made by many indemnitors in many cases that have been reported across the country, where they're basically telling the surety, you shouldn't have paid that claim because the bond doesn't obligate you to pay that claim. And you paid the claim, and you shouldn't have done so under the bond, so therefore, you're not entitled to it to be indemnified. And center plan is making that argument in this case, and many other indemnitors have made that exact same argument in other cases that I cited in my brief, and every single case across the country, every single court across the country that has been addressed with that issue says, no, that's not the standard. The standard on an indemnity claim is what is the language of the indemnity agreement. And that is the same finding that Judge Bryant made in the district court, and he held Arch to the standard that's set forth in the indemnity agreement, and that was the correct standard to hold on to. Mr. Taylor, would you agree, Mr. Taylor, and I'm not an adept in this industry, and I suspect that both you and Mr. Garcia are, but wouldn't it somewhat undermine the whole idea of the surety bond, the security that the owner wants if there's a strong incentive for the insurer to fight and haggle over every claim that's made, because otherwise they'd be afraid of getting sued by or not having an ability to be indemnified by the contractor? That's right. It would totally undermine the entire system that's set up with surety in the construction industry, but the way the indemnity agreement does kind of safeguard the rights of both the owners and the indemnitors, because while the surety is in the middle often, and it has an owner saying the principal has defaulted, and the principal is saying, I didn't default, I did nothing wrong, the surety is stuck in the middle. And how is the surety protected, and how are all the other parties protected? The surety has a duty to investigate the claim independently, not just listen to what the owner is saying, not just listen to what the principal is saying, but rather has to independently make a claim and decide whether or not it's going to honor the claim. Mr. Taylor, can you address the counterclaims for just a minute? I know there are several issues, whether there's a duty or not, but I'm curious about the collateral estoppel issue. He said that the jury's verdict could have been based upon a delay, that therefore would not have been a breach, it would have just been liquidated damages. What's your response to that? The claim that CenterPlan brought against the city of Hartford in the state court action was that the city of Hartford breached the contract and that it wrongfully terminated CenterPlan, and it asked damages for breach against the city of Hartford, damages for the wrongful termination. That claim was tried to the jury and the jury rejected it. The jury had to then deny CenterPlan's allegation, CenterPlan's claim that the city had breached the contract, and they clearly found that they had to find that the city of Hartford did not breach the contract because if the city had breached the contract, it would not have been entitled to any type of damages from CenterPlan. All right. And you also argue there's no duty to begin with, right? There's no duty under the bond by Arch and his position as surety. It has no affirmative duty to CenterPlan as the principal on the bond. It only has a duty to the obligee on the bond. All right. All right. Thank you, Mr. Taylor. Thank you, Mr. Taylor. Mr. Garcia, you have three minutes. Um, Judge Lynch, with all due respect, certainly your articulation of the concept of surety law might be generally accepted across the country, but it's not what the law is in Connecticut. Connecticut, the PSE case and Judge Shea in the Hanover case recognized that, first of all, the surety could breach the bond, in which case the penal limit wouldn't apply. In the PSE case, I think they talked about limits on good faith because I can tell you for a fact, because I tried PSE all through the appeal. There are provisions in that case exactly like the ones in this case, except one very meaningful difference. And this is an enormous difference and Mr. Taylor didn't address it. This bond is unique. It was written this way so that the indemnity surety wouldn't pick up liability for professional malpractice. But every bond specifies what, under what conditions the surety has to pay, right? No, it doesn't. It doesn't. Excuse me. Isn't that the point of the bond? It says that under certain circumstances, the surety is going to have to pay if there's a claim. Most bonds, first of all, there's an incredible historical background on bonds. Many were prescribed by statute. The forms are still from Old English. Most bonds say the obligation of this bond exists as long as it does not exist as long the principal performs. If the principal doesn't perform, the bond becomes useless. Excuse me. Excuse me, Mr. Garcia. Exactly. That's the question I asked you. Doesn't every bond specify that there are certain conditions under which the surety has to pay? And the principal condition is if there's a breach, right? What we said in this particular case was the breach here. Can you say right or wrong? I asked you if that was right. I think it's too much of an overgeneralization. Excuse me. You're telling me there are bonds that don't say? Yes, this bond. This is one of them. This bond says the surety doesn't have to pay if there's professional liability insurance. Of course. Excuse me, Mr. Garcia. Of course. The bond specifies when you have to pay and when you don't have to pay. If there's a claim of breach, if there's a claim of breach, the surety only has to pay if it decides there was a breach, right? No, sir. No. No. They have to pay even if there was no breach. Under your formulation and Mr. Taylor's position, once there's a bond in place, if anything happens that gives rise to a claim, the surety can decide to pay a breach or not. The breach becomes irrelevant. No, it's not irrelevant. It's not irrelevant. They have to decide in good faith that there was a breach. Well, they're not obligated to pay. They can defend against the owner if the owner says there's a breach and there's not a breach, right? You just went to where I wanted to go. I'm saying that in considering the obligation of good faith, one has to consider the provision of the bond, what it says about specific liability. It doesn't just exist in space as some nebulous thing. It's not, excuse me, Mr. Garcia, it's not a nebulous thing at all. There are terms of the bond. I agree. And the insurer has to decide whether it believes that there is a legitimate claim. I agree. Then it decides what to do and the obligation on it is to decide in good faith whether there is liability or in the terms of the indemnity agreement that your client signed, whether it is necessary and expedient to pay the claim. The word is necessary. And they decide that in good faith. Isn't that what it provides? I think you certainly read it exactly right, Your Honor. Except what I'm saying to you is the terms have been qualified by state law, specifically PSC and other cases, Capstone, which talk about the kinds of things that one has to consider. And as we have said in our reply, and as we've said more than one time, the idea of the clarity of the obligation in this bond is affected by the fact that it has express limits, which frankly don't appear in other bonds across the country. So this case is unique. It's a unicorn. But doesn't the question simply boil down to, did Arch decide in good faith that it was appropriate to pay the claim? Not whether it actually was liable, but whether it acted in good faith in making that decision. Okay. Accepting your postulation by one qualification to the yes, I'm about to give you is as follows. The definition of good faith isn't what Judge Bryant found because she, in the review of it, she refused to acknowledge and understand or even take into account at all, the terms of the bond itself, which I think qualify the concept of good faith. And I think also under PSC... But good faith means something different in this contract than it means in every other contract, notwithstanding that Connecticut put good faith into purity bond contracts. On the strength of contract law that says there is always an implied covenant of good faith. No, I think Connecticut law acknowledged that the determination of good faith is a complex question of fact that takes into account the term of the underlying obligation. So that when you say good faith, it's okay to wrap it in the penumbra of some concept. We have good faith. But good faith, as articulated in the cases, is about the honesty of their performance, is about the way people understand their obligation. It's about the terms of the obligation and the liability that occurs with relation to it. So it's a definitional problem. Certainly good faith is the label, but that doesn't mean it's the facts. All right. And the paragraph my partner is standing here going on telling me, in our reply, it says, Senate plan doesn't seek to revisit the entire good faith determination. It does contend that under any reasonable regime, breach of the bond or the breach of the good faith, after Arch stepped in, Arch must disgorge what they basically think they can get from the insurance companies because that's the condition of the bond. All right. Thanks, Mr. Garcia. We gave you an extra three minutes there. I appreciate that, your honor. Thanks so much for your indulgence. Thank you to both of you. We'll reserve decision. Have a good day.